JAMES DUNCAN FUDGE *v.* STATE OF ARKANSAS

CR 73-97                                     498 S.W. 2d 873

Opinion delivered September 17, 1973

*Gene Worsham,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *James W. Atkins,* Asst. Atty. Gen., for appellant.

CARLETON HARRIS, Chief Justice. James Duncan Fudge, appellant herein, was charged with the crime of second degree murder in the alleged slaying of his wife, Dorothy Fudge. During the trial, the court reduced the charge to involuntary manslaughter, and the jury returned a

verdict of guilty, fixing appellant's punishment at three years imprisonment. From the judgment so entered, Fudge brings this appeal. For reversal, it is asserted that the trial court erred in permitting the State to impeach its own witness by proof of a prior contradictory statement.

Lela Mae Bell, a witness on behalf of the State, testified that around 10:30 P.M. on the evening of July 28, 1972, she was playing cards with Mrs. Fudge, and two other women at the Fudge home, when appellant came in with a box of chicken. The witness stated that the wife took a piece of chicken and remarked to appellant, "James, your woman called." No answer being given, the statement was repeated, and Fudge answered, "So she did." Fudge then stated that "The game is over, no more playing cards here at the house," walked back into his bedroom and, according to the witness, "When he come out, well, he come out shooting. ***And he shot four bullets in the floor. He shot four times in the floor. Well, she was standing up by the table and the fifth bullet, well, when he shot that, the fifth bullet, well, I don't know where it hit her but, anyway, when he shot the fifth bullet, he turned around and went back in the bedroom. When he went back in the bedroom, well, she fell. Well, she called Pearl's name. She said 'Pearl', said, 'James shot me now you'll,' so Gladys was standing up in the middle door and I was backed against the wall."

Mrs. Bell then stated that Fudge walked from his room, said, "Lord have mercy, I done shot my wife," picked her up and "carried her to the hospital." On cross-examination, the witness testified that all five shots were fired into the floor, and on redirect examination, Mrs. Bell said that apparently he did not know that he hit his wife until he came back out of the room. She also said that Mrs. Fudge had told her not to "bother him, let him shoot, let him shoot me one time." The State claimed surprise at the testimony of the witness and sought permission to impeach her testimony. The matter was taken up in chambers and it developed that on the morning after the killing, Mrs. Bell had given the police a statement in which she said she was in

another room at the time of the shooting, heard the shots, and on going into the room where the shooting occurred, observed Fudge standing over his wife. On the same morning, she gave to the officers a second statement in which she said she was present in the room where the shooting occurred and observed Fudge go to his bedroom, return with a pistol in his hand, and fire four shots into the floor. Mrs. Bell had then said that she (the witness) begged Fudge not to shoot his wife; that Mrs. Fudge had said, "Don't beg him, let him shoot me one time", and that appellant then fired the last shot which struck the wife in the chest area. Mrs. Bell was the only witness who purportedly observed the shooting, and the State had placed her on the stand for the purpose of establishing malice on the part of appellant. Her testimony was thus essential to the charge of second degree murder. Obviously, the prosecutor had expected Mrs. Bell to testify in accordance with her second statement; it developed that her testimony was not wholly in accord with either statement, but more or less a part of one and a part of the other. The court finally announced that it would permit the State to inquire of the witness if she made a statement "that she wasn't in the room and didn't see it and did she make another statement that she was in the room and did see it and that she saw James shoot her." Back in the courtroom, the prosecutor interrogated Mrs. Bell, and while the witness admitted her signature, she denied some of the matters included in the statement; for instance, she denied that she had stated that she was in another room, heard three or four shots, went back into the room (where the shooting occurred) and saw appellant standing with a gun in his hand and Mrs. Fudge lying on the floor. She also denied making the statement that Fudge had walked into the room, shot four times into the floor, and that she (the witness) had begged him not to shoot Mrs. Fudge.[1]

---

[1]From the record:

"Q Do you recall giving a statement to Detective Bobby Thomas on that same morning in which you said that James Fudge came in, went in the bedroom and came back with a pistol in his hand and fired four shots in the floor, you begged him not to shoot Dorothy, she said 'don't beg him, Lela, let him shoot me one time,' he then fired the gun and the bullet struck Dorothy in the chest area; she was standing up and fell down by the couch

Appellant contends that the court erred in permitting the State to impeach its own witness; that the State could not have been surprised because appellant had already given two versions of events occurring, before she ever testified.

It does not appear necessary to discuss this contention, for even if error occurred, we find no prejudice. Of course, we do not reverse unless prejudicial error is shown. *Keathley* v. *Yates*, 232 Ark. 473, 338 S.W. 2d 335. Assuming, without deciding, that the court erred in permitting the State to attempt to impeach the testimony of its own witness, we cannot see how Fudge was prejudiced. At the conclusion of the testimony, appellant moved to dismiss and the court granted the motion to dismiss the charge insofar as murder in the second degree was concerned, reducing the charge to involuntary manslaughter. That offense is defined by Ark. Stat. Ann. § 41-2209 (Repl. 1964) as follows:

"INVOLUNTARY MANSLAUGHTER DEFINED. —If the killing be in the commission of an unlawful act, without malice, and without the means calculated to produce death, or in the prosecution of a lawful act, done without due caution and circumspection, it shall be manslaughter."

Even if we look at the testimony from the standpoint most favorable to appellant, there was ample and sufficient evidence for the jury to find that he had committed the crime of involuntary manslaughter. In fact, appellant's own statement to the officers (and it is not contended here that such was involuntarily made) is potent evidence to support the reduced charge. From the statement:

"Last night I had been over to my aunts house where I had drank ½ of ½ pint of whisky and I drank one

---

and a lot of blood was coming from Dorothy; Dorothy then said to you and Pearl Butler, 'Help me. James done shot me,' and then James left the room and in a minute he came back and he didn't have the gun and at that point he picked Dorothy up and carried her out the front door. Do you remember giving that statement to the Little Rock Police Department?
A No. That wasn't my statement. I don't remember."

can of beer. I got home about a quarter of one and my wife was giving a card game. I walked in and said yall break the card game up. My wife then told me that I never let her have any fun. I told her for them to break it up right now. I said to myself that I know how to break it up and I went to my bed room and loaded my gun and came back and shot either 4 or 5 times into the floor. After I shot 4 or 5 times in the floor people started moving around. My wife told them that they didn't have to go cause I wouldn't shoot nobody she said I was only trying to scare her. I then shot one shot into the middle of the table or I though[t] I shot the table and my wife fell to the floor and said 'Oh you shot me.' "

We hold that no prejudicial error was committed and that the evidence was sufficient to support the jury verdict.

Affirmed.